IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
NO. 5:24-cv-00171

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>GARRETT W. MORETZ,<br><br>　　　　　Defendant. | **COMPLAINT**<br>**(Jury Demanded)** |

Plaintiff, United States Securities and Exchange Commission ("SEC" or the "Commission"), files this Complaint against Defendant Garrett W. Moretz as follows:

## NATURE OF THE ACTION

1. Moretz is a registered representative and investment adviser representative of Broker A. Moretz deceived multiple retail investors by making repeated misrepresentations to them regarding high-risk debt securities known as L Bonds, which were issued by GWG Holdings, Inc. ("GWG").

2. Moretz, in both electronic mail messages and oral communications, repeatedly misrepresented L Bonds to investors as "guaranteed." Moretz knew the L Bonds he offered and sold to investors were not guaranteed, and he knew they were not guaranteed at the time he represented them as such to investors.

3. Since at least 2017, Moretz misrepresented L Bonds to investors and potential investors as "guaranteed." From at least September 2019 until in or about August 2020, Moretz misrepresented L Bonds as "guaranteed" to four customers who subsequently purchased L Bonds.

1

4. Through his conduct, Moretz violated, and unless restrained will continue to violate, Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

5. The SEC seeks a permanent injunction, disgorgement and prejudgment interest, and civil penalties against Moretz based on his violations of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

## JURISDICTION AND VENUE

6. The Commission brings this action to restrain Moretz from engaging in the transactions, acts, practices and courses of business alleged in this Complaint, and transactions, acts, practices and courses of business of similar purport and object, for disgorgement of illegally obtained funds, civil money penalties, and other equitable relief.

7. This Court has jurisdiction over this action pursuant to Sections 20(b)-(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b)-(d) and 77v(a)], and Sections 21(d)-(e) and 27(a) of the Exchange Act [15 U.S.C. §§ 78u(d)-(e) and 78aa].

8. Venue lies in this district pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa], because transactions, acts, practices and courses of business constituting violations of the federal securities laws occurred, and Defendant transacts business, within the Western District of North Carolina.

9. Defendant, directly and indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

10. There is a reasonable likelihood that Defendant will, unless enjoined, continue to engage in the transactions, acts, practices and courses of business set forth in this complaint, and transactions, acts, practices and courses of business of similar purport and object.

## DEFENDANT

11. **Garrett W. Moretz ("Moretz")**, age 53, lives in Mooresville, North Carolina and is employed by Moretz Wealth Management, LLC, which is also located in Mooresville, North Carolina. Moretz has been a registered representative and investment adviser representative of Broker A since approximately June 2017.

## RELATED ENTITY

12. **Broker A**, headquartered in Rochester, New York, is registered with the Commission as a broker-dealer and investment adviser. Through its registered representatives and investment adviser representatives, including Moretz, Broker A sells securities to retail investors. At all relevant times, L Bonds were one of the securities offered for sale by Broker A.

## FACTS

### A. GWG and the L Bonds

13. GWG was a financial services company. Prior to 2018, GWG's business model involved purchasing life insurance policies from consumers who no longer wanted or needed them. GWG continued to pay the premiums and collected the policy benefits upon the insured's death. As the result of a series of transactions in 2018 and 2019, GWG stopped acquiring life insurance policies and transitioned its business model to focus on providing liquidity to a broader range of alternative assets.

14. GWG had a history of net losses and had never generated sufficient cash flows to fund its operations. As such, GWG depended on financing, primarily debt financing, including the sale of L Bonds to the public, to fund its operations.

15. L Bonds were corporate bonds issued by GWG and sold to retail investors through a network of broker-dealers, including Broker A. As of December 31, 2019, GWG had approximately $1.3 billion in L Bonds outstanding. The credit risk of L Bonds was not rated by any independent rating agency.

16. For the year ended December 31, 2019, GWG posted a net loss from operations of $79.6 million and a negative operating cash flow of $142.8 million.

17. GWG's largest tangible asset was its portfolio of life insurance policies, which had a recorded fair value of $796 million as of December 31, 2019. But L Bond holders' claims to GWG's life insurance assets were subordinated to a senior credit facility, which had a direct security interest in most of the life insurance policies.

18. As of December 31, 2019, GWG's largest asset was goodwill, which constituted approximately 65% of GWG's assets. Goodwill is an intangible asset that cannot be used to pay down debt. Eliminating goodwill, GWG's liabilities were well in excess of its assets as of December 31, 2019.

19. During the relevant time, GWG offered L Bonds pursuant to prospectuses dated December 1, 2017 and June 3, 2020. Both prospectuses were supplemented multiple times. The supplements each stated that they should be read in conjunction with the prospectus, and that the information in the supplements was qualified by reference to the prospectus. (The December 1, 2017 and June 3, 2020 prospectuses, as well as each supplement to those prospectuses, are collectively referred to as the "Prospectuses.")

20. GWG filed all of the Prospectuses with the Commission. All of the Prospectuses were publicly available at no charge through the Commission's EDGAR system and could be accessed by Moretz at any time. GWG also provided the Prospectuses to broker-dealer and investment adviser firms that sold L Bonds, including Broker A.

21. Both the December 1, 2017 and June 3, 2020 prospectuses stated: "Investing in our L Bonds may be considered speculative and involves a high degree of risk, including the risk of losing your entire investment."

22. Both the December 1, 2017 and June 3, 2020 prospectuses, further stated: "L Bonds are only suitable for persons with substantial financial resources and with no need for liquidity in this investment."

23. The Prospectuses disclosed that the same assets backing the L Bonds were pledged as direct collateral securing GWG's obligations under a senior credit facility. As the December 1, 2017 and June 3, 2020 prospectuses both stated: "[t]hese facts present the risk to investors that the collateral security . . . granted for our obligations under the L Bonds may be insufficient to repay the L Bonds when they become due."

24. The Prospectuses disclosed that L Bond holders had no right to require GWG to redeem any L Bond prior to its due date, except in the case of the holder's death, bankruptcy, or total permanent disability. The Prospectuses disclosed that GWG, in its sole discretion, could allow an L Bond holder to redeem an L Bond prior to maturity, less a 6% fee, but that GWG was not required to do so.

25. Both the December 1, 2017 and June 3, 2020 prospectuses disclosed that GWG did not intend to list L Bonds on any securities exchange during the offering period, nor did it expect a secondary market in the L Bonds to develop. They further stated: "As a result, you should not expect to be able to resell your L Bonds regardless of how we perform. Accordingly, an investment in our L Bonds is not suitable for investors that require liquidity in advance of their L Bond's maturity date."

26. In April 2021, GWG halted L Bond sales because it was unable to file its 2020 Form 10-K with the Commission. GWG did not file its 2020 Form 10-K until November 5, 2021. GWG

5

resumed L Bond sales on December 1, 2021, but suspended them again on January 10, 2022. From January 15, 2022 onwards, GWG failed to make any interest or principal payments that were due on outstanding L Bonds. On April 20, 2022, GWG filed for Chapter 11 bankruptcy.

### B. Defendant Moretz's Sale of L Bonds

27. Moretz has worked at various investment advisers and broker-dealers for more than 20 years. Moretz has been a registered representative and investment adviser representative of Broker A since in or about June 2017.

28. At all relevant times, Moretz received commissions from Broker A for investments he sold to his brokerage customers and a fee that was a percentage of assets under management for his investment advisory clients.

29. Moretz, through Broker A, sold L Bonds to customers from 2017 until at least December 2020.

30. During the time he was selling L Bonds, Moretz knew the risks of L Bonds included the possibility investors would lose their entire investment. Moretz considered L Bonds a speculative investment because there was a risk an investor would lose 100% of their principal.

31. Moretz knew that at the time he was selling L Bonds the interest payments on L Bonds were not guaranteed.

32. Moretz knew at the time he was selling L Bonds that the return of an investor's principal was not guaranteed.

33. Moretz knew that at the time he was selling L Bonds that they were not an investment vehicle for preserving an investor's funds.

#### a. Guarantees and Securities

34. The Financial Industry Regulatory Authority ("FINRA") is a self-regulatory organization for broker-dealers and is a registered securities association under Section 15A of the

Exchange Act [15 U.S.C. § 78o-3]. Broker A is a member of FINRA, and its registered representatives are required to follow rules promulgated by FINRA.

35. FINRA Rule 2150, titled "Improper Use of Customers' Securities or Funds; Prohibition Against Guarantees and Sharing in Accounts[,]" states that "No member or person associated with a member shall guarantee a customer against loss in connection with any securities transaction or in any securities account of such customer."

36. Broker A's Written Supervisory Procedures similarly provide: "Exaggerated claims, unwarranted superlatives or guarantees should never be used. FINRA Conduct Rule 2150 prohibits any individual associated with [Broker A] from guaranteeing a customer against loss in connection with ANY securities transaction or in ANY securities account of such customer. This prohibition against guarantees is not solely for securities transactions effected through [Broker A]."

37. Moretz knew he was prohibited from making guarantees related to securities, either as to their return or against loss. Moretz knew that restriction applied to Broker A customers and potential customers for the offer or sale of securities, including L Bonds.

### b. Broker A's Email Policies and Procedures

38. Broker A's Written Supervisory Procedures require that, "All business email communications of a [Broker A] registered representative must occur through their [Broker A] email address. This requirement applies to [Broker A] related business correspondences with [Broker A] customers or prospective customers[.]"

39. Moretz regularly used a non-Broker A email account to discuss securities business with Broker A customers.

### c. Defendant Moretz's Sales to Customer 1 and Customer 2

40. Moretz misrepresented L Bonds as guaranteed to a pair of investors, husband ("Customer 1") and wife ("Customer 2"), who purchased an aggregate of $154,500 in L Bonds through Moretz between January 2020 and December 2020.

41. In or about September 2019, prior to any L Bond purchases by either Customer 1 or Customer 2, Moretz sent Customer 1 an email describing an investment product for Customer 1 and Customer 2 to consider. The investment Moretz described in the email was L Bonds.

42. Moretz's email to Customer 1 asked: "Want to take some money out of the market for preservation?" In making that statement, Moretz represented that L Bonds were an investment vehicle for preserving an investor's assets.

43. Moretz's email to Customer 1 made multiple references to L Bonds being guaranteed:

   a. "Are you looking for a great guaranteed rate of return and payout on your money?"

   b. "We have fully guaranteed investment/income options available in 2, 3, 5, and 7 year terms."

   c. "These are guaranteed to pay the specified rate of return MONTHLY for the predetermined period after which you get your full investment returned."

   d. "These are all great opportunities for folks that want a steady rate of return and guaranteed payout."

44. Moretz's email to Customer 1 guaranteed the monthly rate of return and return of principal for an L Bond investment.

45. Moretz sent the email to Customer 1 from a non-Broker A email account even though it was a business communication to a customer or prospective customer regarding a security

8

offered by Broker A, which Broker A's Written Supervisory Procedures required be sent from Moretz's Broker A email address. Moretz knew or was reckless in not knowing that if he had sent the email through his Broker A email account, Broker A likely would not have approved the email because it made guarantees regarding an investment.

46. The language in Moretz's email to Customer 1 was consistent with conversations Moretz had with Customer 1 and Customer 2 each time they purchased an L Bond. During those conversations, Moretz orally misrepresented to Customer 1 and Customer 2 that L Bonds' principal, interest, and rate of return were guaranteed.

47. Moretz failed to tell Customer 1 and Customer 2 that L Bonds were a speculative or high-risk investment. Whether L Bonds were a speculative and high-risk investment was an important consideration for potential investors like Customer 1 and Customer 2.

48. The money Customer 1 and Customer 2 invested in L Bonds was money they could not afford to lose; they had held it in a bank for approximately 20 years and intended to use it for their children's college education and other expenses.

49. Moretz's misrepresentations of L Bonds as guaranteed were important to the decision of potential customers, like Customer 1 and Customer 2, to invest in L Bonds.

50. When Moretz represented to Customer 1 and Customer 2 that L Bonds were guaranteed, he knew or was reckless in not knowing that investors were not guaranteed to receive interest payments on L Bonds or the return of principal invested in L Bonds.

51. When Moretz represented to Customer 1 and Customer 2 that L Bonds were a means of preserving assets, he knew or was reckless in not knowing that his representations were false.

52. When Moretz represented to Customer 1 and Customer 2 that L Bonds' principal, interest, and rate of return were guaranteed, he knew or was reckless in not knowing that his representations were false.

9

53. Moretz knew that FINRA Rule 2150 prohibited him from making guarantees with respect to securities. Moretz also knew or was reckless in not knowing that his representation of L Bonds as guaranteed in his September 2019 email violated FINRA Rule 2150.

54. Moretz knew that Broker A's Written Supervisory Procedures prohibited him from making guarantees with respect to securities. Moretz also knew or was reckless in not knowing that his representation of L Bonds as guaranteed in his September 2019 email violated Broker A's Written Supervisory Procedures.

55. After receiving Moretz's email to Customer 1, and after Moretz told Customer 1 and Customer 2 that L Bonds' principal, interest, and rate of return were guaranteed, Customer 1 and Customer 2 purchased three L Bonds totaling $99,500 in January 2020.

56. Customer 1 and Customer 2 purchased an additional $30,000 L Bond from Moretz in May 2020 and another $25,000 L Bond in December 2020, bringing their aggregate L Bond purchases from Moretz to $154,500. Before both their May 2020 and December 2020 purchases, Customer 1 and Customer 2 had additional conversations with Moretz, in which he reiterated his misrepresentations that L Bonds were guaranteed.

57. Moretz received commission payments from Broker A as a result of all of the L Bond purchases by Customer 1 and Customer 2.

### d. Defendant Moretz's Sale to Customer 3

58. Moretz misrepresented L Bonds as guaranteed to a customer ("Customer 3") who purchased a $45,000 L Bond from Moretz in or about August 2020.

59. Customer 3 first learned of L Bonds from a series of three emails Moretz sent her in the summer and fall of 2017. Moretz sent the emails to Customer 3 from a non-Broker A email account. The three 2017 emails Moretz sent Customer 3 were nearly identical to one another and very similar to the email he sent to Customer 1 in September 2019. The emails all referred to L

Bonds by making repeated references to a "guaranteed" investment whose terms and interest rates were consistent with L Bonds.

60. At a meeting with Customer 3 in the spring of 2018, Moretz again proposed L Bonds as an investment. Moretz told Customer 3 that L Bonds had a higher return than her current holdings. Moretz also represented to Customer 3 that L Bonds were safe, with guaranteed payments. Customer 3 decided not to purchase L Bonds at that time.

61. In or about late July 2020, Moretz telephoned Customer 3 and again proposed that she purchase L Bonds, because according to Moretz L Bonds would provide a better return than she was getting on other investments. Moretz told Customer 3 that L Bond returns were "safe" and "guaranteed," and she would get her money back. Moretz also told Customer 3 that L Bonds were an insurance product.

62. After Moretz told her that L Bonds were guaranteed, Customer 3 decided to purchase a $45,000 L Bond in August 2020. Moretz's misrepresentations of L Bonds as guaranteed were important to potential customers, like Customer 3, in deciding whether to invest in them.

63. Moretz knew or was reckless in not knowing the statements he made to Customer 3 that L Bonds were safe were false at the time he made the statements.

64. Moretz knew or was reckless in not knowing the statements he made to Customer 3 that L Bonds were guaranteed were false at the time he made the statements.

65. Moretz knew or was reckless in not knowing that his representations to Customer 3 that L Bonds were guaranteed violated FINRA's prohibition on guarantees.

66. Moretz knew or was reckless in not knowing that his representations to Customer 3 that L Bonds were guaranteed violated Broker A's Written Supervisory Procedures.

67. Moretz received commission payments from Broker A as a result of Customer 3's purchase of L Bonds.

### e. Defendant Moretz's Sale to Customer 4 Through Customer 3

68. Customer 4 is the sister of Customer 3. Customer 4 had received a medical settlement for her permanently disabled son and wanted to invest the proceeds of that settlement to enable him to secure a place to live in a few years. Customer 4 told Moretz she had no tolerance for risk and wanted the investment to be as safe as possible. Customer 4 told Moretz the money she was investing was all of the money her disabled son had, and they could not afford to lose any of it.

69. Moretz told Customer 4 that L Bonds were 100% safe and 100% guaranteed with regard to both the principal and interest and there was zero risk in an investment in L Bonds.

70. On July 28, 2020, Moretz sent Customer 4 an email in which he described two investment options – multi-year guaranteed annuities and L Bonds. Moretz represented that both had "guaranteed payouts for the specified period[,]" and represented separately that L Bonds were "guaranteed for the specified period." Moretz's email also identified a third option of opening an investment account, but it explained that the investment account "would come with the risk of loss which may not be suitable due to the purpose of the money." Moretz sent the email from a non-Broker A email address.

71. After receiving the July 28, 2020 email from Moretz, Customer 4 decided to purchase a $45,000 L Bond.

72. Moretz's misrepresentations of L Bonds as guaranteed were important to potential customers, like Customer 4, in deciding whether to invest in them.

73. Moretz knew or was reckless in not knowing the representations he made to Customer 4 that L Bonds had a guaranteed payout were false at the time he made the statements.

74. Moretz knew or was reckless in not knowing the representations he made to Customer 4 that L Bonds were guaranteed for the specified period were false at the time he made the statements.

75. Moretz knew or was reckless in not knowing the representations he made to Customer 4 that L Bonds did not come with the risk of loss were false at the time he made the statements.

76. Moretz knew or was reckless in not knowing the representations he made to Customer 4 that L Bonds were 100% safe and 100% guaranteed with regard to both the principal and interest and that there was zero risk in an investment in L Bonds were false at the time he made the statements.

77. Moretz knew or was reckless in not knowing that his representations to Customer 4 that L Bonds were guaranteed violated FINRA's prohibition on guarantees.

78. Moretz knew or was reckless in not knowing that his representations to Customer 4 that L Bonds were guaranteed violated Broker A's Written Supervisory Procedures.

79. Customer 4 had minimal investable assets outside of the settlement funds for her disabled son. Broker A's Written Supervisory Procedures limited a customer's allocation to non-liquid investments, such as L Bonds, to 15% of the customer's total investable assets. Moretz knew Customer 4 did not have sufficient investable assets to qualify to invest her disabled son's settlement funds in L Bonds.

80. In order to evade Broker A's limitation on non-liquid investments, Moretz told Customer 4 that Customer 3 could invest in L Bonds on behalf of Customer 4 and Customer 4's son, using their money. Moretz explained to Customer 4, however, that payment for her L Bond purchase would have to come from Customer 3.

81. On August 10, 2020, Moretz sent an email to both Customer 3 and Customer 4 "to check in to make sure everything is OK for us to start sending over the GWG L-Bond forms." Moretz sent the email to Customer 3 and Customer 4 from a non-Broker A email account.

82. On August 13, 2020, Customer 3 emailed the completed forms for Customer 4's L Bond purchase back to Moretz and copied Customer 4 on the email. Customer 3's email stated that she was attaching "the signed forms for the L-Bonds for [Customer 4's son]/[Customer 4]." Customer 3 used the name of Customer 4's son in the filename of the attached PDF file containing the signed documents.

83. At 8:47 a.m. on August 14, 2020, Moretz emailed Customer 3, copying Customer 4 on the email: "The check must come from a bank account in your name in order to be in good order." Moretz sent the 8:47 a.m. email from a non-Broker A email account.

84. At 9:36 a.m. on August 14, 2020, Customer 4 emailed Moretz and asked: "Does the origination of the check matters, should it come from [Customer 3]'s account?" At 10:17 a.m. on August 14, 2020, Moretz responded with an email to Customer 4 stating: "Yes, it must come from [Customer 3]'s account. The interest must also be paid to an account with her name on it." Moretz sent the 10:17 a.m. email to Customer 4 from a non-Broker A email account.

85. Customer 4 conveyed $45,000 from her son's medical settlement to Customer 3 to purchase L Bonds on their behalf. Customer 3, using the funds provided by Customer 4, wrote a check dated August 18, 2020 for the purchase of the L Bonds for Customer 4. In the memo line of the check, Customer 3 wrote: "Moretz for [Customer 4's son]".

86. Moretz knew that Customer 3 was purchasing the L Bond on behalf of Customer 4 and Customer 4's son. Moretz knew or should have known that the source of funds for the purchase was the medical settlement for Customer 4's son.

87. As part of an L Bond purchase, Broker A registered representatives completed an L Bond subscription agreement, a transaction cover sheet, and a client acknowledgment form. Registered representatives submitted the completed documents to a Broker A supervisor for review.

88. To conceal the true purpose of the transaction, Moretz made several false statements on the transaction cover sheet he submitted for Broker A's supervisory review for the L Bonds Customer 3 purchased for Customer 4 and Customer 4's son. Moretz falsely identified the client as Customer 3 and made no mention of Customer 4 or her son. Moretz further falsely identified the source of funding as Customer 3's savings and made no mention of Customer 4 or the medical settlement. Moretz further identified the reason for the choice of L Bonds as "[Customer 3] would like to put some of her savings into a short-term investment with better interest than her bank savings account." Moretz made no mention of Customer 3 purchasing the L Bonds on behalf of Customer 4 and her son, Customer 4's lack of sufficient assets to purchase L Bonds, or the need to preserve the money to pay living expenses for Customer 4's disabled son.

89. On August 17, 2020, Moretz submitted the Transaction Cover Sheet, along with other documents, for Customer 3's purchase on behalf of Customer 4 and Customer 4's son for supervisory review. Moretz did not disclose to the supervisor that he had made false statements on the transaction cover sheet. Moretz did not disclose that Customer 3 was purchasing the L Bonds on behalf of Customer 4 and Customer 4's son, who did not have sufficient assets to qualify to purchase L Bonds. After receiving the document package, including the false statements on the transaction cover sheet, a Broker A supervisor approved the purchase.

90. Moretz received commission payments from Broker A as a result of Customer 3's purchase of L Bonds on behalf of Customer 4 and Customer 4's son.

## COUNT I
## Fraud in the Offer or Sale of Securities
### [Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a)]

91. Paragraphs 1-90 are hereby realleged and incorporated herein by reference.

92. By engaging in the acts and conduct described in this Complaint, Defendant Moretz, directly or indirectly, in the offer or sale of securities to Customer 1, Customer 2, Customer 3, and

15

Customer 4, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, used and employed devices, schemes, or artifices to defraud; obtained money or property by means of untrue statements of a material fact or an omission to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and engaged in transactions, practices, or courses of business which operated or would operate as a fraud and deceit upon the purchaser.

93. Moretz engaged in the fraudulent conduct described above intentionally, recklessly, and/or negligently.

94. By reason of the foregoing, Defendant Moretz, directly or indirectly, violated, and, unless enjoined, will continue to violate Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

**COUNT II**
**Fraud in Connection with the Purchase or Sale of Securities**
**[Exchange Section 10(b), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5]**

95. Paragraphs 1-90 are hereby realleged and incorporated herein by reference.

96. By reason of the acts and conduct described in this Complaint, Defendant Moretz directly or indirectly, in connection with the purchase or sale of securities to Customer 1, Customer 2, Customer 3, and Customer 4, by the use of means or instrumentalities of interstate commerce or of the mails or any facility of a national securities exchange: (a) used and employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud and deceit upon any person.

97. Moretz engaged in the fraudulent conduct described above intentionally or recklessly.

98. By reason of the foregoing, Moretz, directly or indirectly, violated, and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

**PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that this Court:

**I.**

Issue a judgment, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendant Moretz, and his officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

**II.**

Issue a judgment, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendant Moretz, and his officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b- 5 thereunder [17 C.F.R. § 240.10b-5].

**III.**

Order Defendant to pay disgorgement of any unjust enrichment he received as a result of the misconduct alleged, together with prejudgment interest thereon, under Sections 21(d)(3), 21(d)(5) and 21(d)(7) of the Exchange Act, 15 U.S.C. §§ 78u(d)(3), 78u(d)(5), 78u(d)(7).

**IV.**

Order Defendant to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

**V.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**VI.**

Grant such other and further relief as this Court may determine to be just and necessary.

## JURY DEMAND

The SEC demands a trial by jury on all claims so triable.

Dated: July 29, 2024.

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION

By: /s/ Christopher H. White
Christopher H. White (IL Bar No. 6280031)
Jonathan Epstein (IL Bar No. 6237031)

175 West Jackson Blvd, Suite 1450
Chicago, IL 60604
Telephone: (312) 353-7390
E-mail: whitech@sec.gov